UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

KIMBERLY HARTMAN,

                Plaintiff,                Case No. 13-cv-14774

v                                      Honorable Thomas L. Ludington

THE DOW CHEMICAL COMPANY,

                Defendant.

_____/

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT AND CANCELLING HEARING**

Plaintiff Kimberly Hartman filed suit against her former employer, Defendant Dow Chemical Company, claiming that she was wrongfully terminated from her position as a Legal & Government Affairs Administrative Specialist in the Corporate Division. Specifically, she claims that Defendant violated the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2611, *et seq*., and Michigan's People with Disabilities Civil Rights Act ("PWDCRA") when it terminated her employment.

On October 17, 2014, Defendant filed a motion for summary judgment, seeking judgment on all of Plaintiff's claims. The motion will be denied in part because Plaintiff has sufficiently demonstrated that a question of material fact exists regarding whether Defendant's proffered reason for terminating her employment was pretextual—which would violate the FMLA's anti-retaliatory provisions. However, Plaintiff has not demonstrated a question of material fact regarding her remaining claims for FMLA interference and violation of the PWCRA and so these claims will be dismissed.

**I**

On June 3, 2010, Defendant hired Plaintiff as a Legal & Government Affairs Administrative Specialist in its Corporate Department.  Plaintiff worked on worker's compensation claims and real estate matters, in addition to providing support for an attorney, Toby Threet.  She reported directly to John Ingold, also an attorney.  Plaintiff also worked closely with Stacy McKeon, a paralegal, and Dana Chauvette, a co-op.

During her time at Dow, Plaintiff received favorable reviews of her work performance. Her supervisor, Mr. Ingold, noted that Plaintiff was "a good solid employee."  Her performance reviews reveal similar comments; in her 2012 Performance Review, Mr. Ingold notes that Plaintiff "[m]eets [j]ob [e]xpectations" before explaining:

> Kim had a very good year as an important member of the very successful Michigan Ops Legal team.  Stacy and Toby really value what Kim brings to the table, and her willingness to help out in any way that she can.  Kim has also been a very good mentor for Dana.  In 2013, I agree that it will be a key goal for Kim to take more from Stacy's plate as Kim continues to develop her knowledge and expertise.

Resp. Ex. 2 at 4.

Plaintiff worked an alternative Friday off schedule, which means that she worked a total of eighty hours in nine workdays with every other Friday off.  Plaintiff explains that she would typically arrive around 8:15 a.m. and leave between 3:30 p.m. and 4:30 p.m.  She further explains that she would make up any additional hours at home.

**A**

Plaintiff suffers from psoriatic arthritis, a degenerative condition that causes damage to her joints.  In 2012, she developed increasingly worsening pain in her shoulder.  Specifically, there was swelling in her shoulder, and sometimes she would lose feeling in her hand.  She also

had trouble lifting her arm behind her head, reaching behind her, and moving or lifting heavy objects.

In the spring of 2013, the pain progressed to such a degree that Plaintiff needed surgery. As she explained in an e-mail on April 10, 2013:

> I'm sorry to say that I have been told by my Rheumatologist, that I need surgery for the pain in my shoulder that has been getting worse over the past year. Distal Clavicle Resection is the technical name of what they need to do. The end of my collar bone is wearing away, and causing pain, lots of it.

Resp. Ex. 2 at 8. Plaintiff's surgery was scheduled for May 28, 2013, and she notified Dow that she would be out for approximately 4 to 6 weeks. Plaintiff concedes that she received no pushback about the time off:

> Q:        Did you get any pushback from anyone, Mr. Ingold or anybody you worked with about you going out to have surgery?
>
> Hartman:   No, I did not.

Mot. Summ. J. Ex. A at 25.

Although Plaintiff had estimated that she would be able to return to work in July, her surgeon did not release her to work in July. Instead, the surgeon decided to re-evaluate her progress on August 19, 2013. Mr. Ingold asked for additional details regarding her medical restrictions, which she provided.

Plaintiff nonetheless believed that she could return to work at Dow even before August 19, and she began working half days at the end of July. Then, on August 19, 2013, she was released to work full time with no restrictions.

Dow approved Plaintiff's FMLA leave for the entire time she was absent and recovering, beginning on May 28, 2013, and ending August 20, 2013. After returning to work, Plaintiff thanked the people she worked with for their patience and understanding.

- 3 -

**B**

At some point in April, Stacy McKeon, Plaintiff's coworker, began to question how much—or little—Plaintiff was actually working.  Ms. McKeon observed Plaintiff leaving the office early on numerous occasions, and she began recording her absences in a journal.  On May 8, 2013, McKeon informed Plaintiff's and her supervisor, Mr. Ingold, that Plaintiff appeared to be out of the office too much.

While Plaintiff was on medical leave for her shoulder surgery, her job duties were assumed by co-op Dana Chauvette. Ms. Chauvette contends that she had to repeatedly address issues arising from uncompleted tasks that were assigned to Plaintiff, some of which were from 2012.  The revelation of Plaintiff's alleged poor performance made "Dow's concern about Hartman's time reporting  . . . even more acute . . . ."  Mot. Summ. J. 6.

As a result, after Plaintiff returned to work full time in August 2013, Dow began looking more carefully at Plaintiff's time cards.  Plaintiff's supervisor, Jack Ingold, requested that Ms. McKeon keep track of when Plaintiff was physically at work.  A Dow Human Resources Manager, Sara Mose, requested Plaintiff's gate records from August 15, 2013 through September 20, 2013.  These records revealed that there was a 60-hour discrepancy between the hours Plaintiff recorded on her electronic time sheet and the hours she was physically on Dow's premises.

On September 27, 2013, Mr. Ingold and Ms. Mose met with Plaintiff to discuss the apparent 60-hour discrepancy.  Plaintiff explained that she worked at home for about 2-2.5 hours each night.  Plaintiff further explained that she did not usually log on to the VPN at home, because she was generally moving files and emails into files offline.[1]  Defendant's review of

---

[1] At the time of the meeting with Mr. Ingold and Ms. Mose, this was the only explanation Plaintiff offered.  In her deposition, however, Plaintiff also asserted that she was reviewing two instruction manuals.

Plaintiff's VPN records indicated that she had logged on to Dow's network on just two days: September 10 and September 23.

Defendant did not believe that Plaintiff could have invested 2-2.5 hours of work a night without logging on to the VPN. Therefore, Ms. Mose and Mr. Ingold called for an Employee Review Meeting, in which an employee's supervisors and various other members of human resources review an employee's actions to determine whether termination is appropriate. The ERM concluded that Plaintiff had falsified time sheets and terminated Plaintiff's employment on October 3, 2013.

## II

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

## III

Plaintiff asserts that Defendant violated both the FMLA and the PWDCA, and she asserts several theories of liability under each statute. Each will be analyzed in turn.

**A**

The Sixth Circuit has recognized two discrete theories of recovery under the FMLA: (1) the "interference" theory arising under § 2615(a)(1), and (2) the "retaliation" theory arising from § 2615(a)(2).  *Seeger v. Cincinnati Bell Telephone Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012). Although Plaintiff pleads both theories in her Complaint, she combines the analysis of the two theories in her response to Defendant's motion for summary judgment: "Because of the overlap between Plaintiff's claim of interference and retaliation, it makes sense to analyze the claim under the same standards."  Resp. 18.

The Court declines to analyze both claims under the same standard, as Plaintiff suggests. Although a claim for retaliatory discharge is cognizable under either theory, the Sixth Circuit has clarified that the requisite proofs differ.  *Seeger*, 681 F.3d at 282.  The main distinction between the two theories is the employer's intent.  The interference theory has its roots in the FMLA's creation of substantive rights, and "[i]f an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred," regardless of the intent of the employer.  *Id*. (quoting *Arban v. West Pub. Co.*, 345 F.3d 390, 401 (6th Cir. 2003)). In contrast, the central issue raised by the retaliation theory is "whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason."  *Id*. (quoting *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006)).  In other words, an employer's intent is relevant only in retaliation claims because those claims "impose liability on employers that act against employees specifically *because* those employees invoked their FMLA rights."  *Id*. (citing *Edgar*, 443 F.3d at 508) (emphasis original).

Moreover, the Sixth Circuit has recently clarified that not all interference claims are synonymous with retaliation claims.  *Wallner v. Hilliard*, 2014 WL 5488172, at *5 (6th Cir. Oct.

31, 2014). "[t]he mere fact that two statutory provisions may both be implicated by a single act does not mean that the two provisions are perfectly coextensive." *Id*. For example, where, as here, a plaintiff receives all FMLA benefits to which she is entitled, "'the essence' of the plaintiff's claim is likely a retaliation claim, not an interference claim, regardless of the conclusory labels under which it has been plead." *Id*. Accordingly, each of Plaintiff's claims will be analyzed individually rather than combining the analyses.

**B**

Defendant first asserts that Plaintiff's FMLA interference claim cannot survive summary judgment. FMLA interference claims arise under 29 U.S.C. § 2615(a)(1), which provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided in this subchapter." To establish a prima facie case of interference, the plaintiff must prove that: (1) she was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) she was entitled to leave under the FMLA; (4) she gave notice of her intention to take leave to her employer; and (5) the employer denied her FMLA benefits to which she was entitled. *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006) (citing *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005)).

Defendant contends that Plaintiff cannot establish the last element of her prima facie case: that she was denied FMLA benefits to which she was entitled. On April 10, 2013, Plaintiff notified her supervisor that she would need surgery and that she would need to be out approximately 4-6 weeks. Defendant approved her FMLA leave request for shoulder surgery

through August 20, 2013.[2]  Resp. Ex. 2 at 38.  Plaintiff acknowledged that she did not receive any "pushback" regarding the time she needed to take off.

Although Plaintiff expected to return to work six weeks after her surgery, her surgeon did not release her to return to work as anticipated because a tendon in her shoulder was not healing as quickly as expected.   Plaintiff was able to return to work on a part-time basis (approximately 3-4 hours per day) on July 29, 2013. A little over two weeks later, on August 19, 2013, she was released by her surgeon to return to work full time.  Defendant approved Plaintiff's FMLA leave for the entire time period she was off work—beginning May 28, 2013 and ending August 20, 2013.  Defendant voluntarily paid Plaintiff in accordance with its leave policy during the entire time of her FMLA leave, which is not required under the FMLA.

In other words, Defendant claims that Plaintiff received every FMLA benefit to which she was entitled and more: leave, payment during the leave, an extension of her leave, and the return of her employment at the end of the leave.  Plaintiff does not dispute these facts, nor does she attempt to identify a benefit that she did not receive.  Because Plaintiff received every FMLA benefit to which she was entitled, she cannot establish a prima facie case of FMLA interference. *See Seeger*, 681 F.3d at 283 (Employer did not interfere with employee's use of FMLA leave where he received all FMLA leave to which he was entitled, he was reinstated upon doctor's certification, and he resumed his normal work routine until his termination.).   Accordingly, summary judgment will be granted with respect to Plaintiff's FMLA interference claim.

## C

Plaintiff also asserts a claim for FMLA retaliation, alleging that Defendant terminated her employment because she took FMLA leave.  For a retaliation claim, a plaintiff must establish

---

[2] Although Plaintiff contends that Defendant did not properly handle her FMLA paperwork, she cannot show that she was prejudiced by this mishandling; that is, even though the paperwork was not necessarily handled in the appropriate time frame, Plaintiff still received every FMLA benefit she was entitled to.

that: "(1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was causal connection between the protected FMLA activity and the adverse employment action."[3] *Killian*, 454 F.3d at 556 (citing *Arban*, 345 F.3d at 404).

**i**

Defendant asserts that Plaintiff cannot establish the final element of her prima facie case: that there was a causal connection between her FMLA leave and the adverse employment action. To satisfy this element, a plaintiff must present sufficient evidence to "raise [an] inference that her protected activity was the likely reason" for the adverse action. *Sosby v. Miller Brewing Co.*, 211 F. App'x 382, 387 (6th Cir. 2006) (quoting *Zanders v. Nat'l R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir. 1990).  However, "[t]he burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there [was] a causal connection between the retaliatory action and the protected activity." *Cutcher v. Kmart Corp.*, 364 F. App'x 183, 190 (6th Cir. 2010).

Plaintiff relies on the temporal proximity of events to show causation.  Plaintiff returned from her FMLA leave on August 20, 2013, and Defendant terminated her employment on October 3, 2013—one month and thirteen days later.  Plaintiff asserts that this close temporal proximity is sufficient, standing alone, to establish the "causal connection" element of her prima facie case.

---

[3] The Sixth Circuit "applies the familiar burden-shifting test articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to retaliation claims under the FMLA." *Edgar v. JAC Products, Inc.* 443 F.3d 501, 508 (6th Cir. 2006) (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 313-16 (6th Cir. 2001) and *Rodriguez v. Ford Motor Co.*, 382 F. Supp. 2d 928, 933 (E.D. Mich. 2005)) (internal citations omitted).

Although temporal proximity alone is generally insufficient to establish circumstantial evidence of a causal connection, the Sixth Circuit has clarified that, in some circumstances, temporal proximity alone can suffice to show a causal connection in a retaliation case: "Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516 (6th Cir. 2008) (analyzing temporal proximity under the ADEA and Elliot-Larsen Civil Rights Act).[4]

With respect to claims for FMLA retaliation, the Sixth Circuit has held that a span of less than three months is sufficient to create an inference of a causal connection. *See Clark v. Walgreen Co.*, 424 F. App'x 467, 473 (6th Cir. 2011) ("[T]he court correctly credited the temporal proximity [two months] of [the plaintiff's] leave and his firing as sufficient evidence of a causal connection between the two."); *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) (holding that a three-month time lapse between the plaintiff's request for FMLA leave and her termination on the day she was scheduled to return to work established a causal connection at the prima facie stage). Here, Plaintiff has carried her prima facie burden of establishing causality through close temporal proximity that is suggestive of retaliation: her employment was terminated about one and a half months after she returned from her FMLA leave.[5]

---

[4] The Sixth Circuit relies on other employment discrimination law to fill the gaps in FMLA case law. *See, e.g., Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696 (6th Cir. 2008) (relying on ADA, ADEA, and Title VII cases); *Bryson*, 498 F.3d at 561 (same).

[5] Throughout her deposition, Plaintiff suggests that there "was a different atmosphere" when she came back to work, and that her supervisor, Mr. Ingold, was more "curt." Hartman Dep. 99-101. Although Plaintiff does not argue the point in her response, Defendant contends that such a "subjective feeling" is insufficient to establish a causal connection. Mot. Summ. J. 12-13 (citing *Gambill v. Duke Energy Corp.*, 456 F. App'x 578 (6th Cir. 2012)). Defendant is correct that an employee's subjective feeling—without any other evidence—is insufficient to establish a prima facie case. Here, however, Plaintiff can introduce evidence of her subjective feeling because she has already established a causal connection through temporal proximity. Thus, this circumstance is unlike the situation in *Gambill*, where the employee-plaintiff could not establish a causal connection through temporal proximity.

**ii**

Because Plaintiff has established a prima facie case of FMLA retaliation, the burden then shifts to Defendant to show that it had a legitimate reason for terminating her employment. Defendant is not required to meet this burden by a preponderance of the evidence, but rather "the employee's prima face case of discrimination will be rebutted if the employer articulates lawful reasons for the action; that is, to satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981).

Defendant claims that it terminated Plaintiff's employment because she falsified her timesheets. Falsifying timesheets is legitimate, nondiscriminatory reason to terminate an employee. *Espitia v. Procter & Gamble Co.*, 93 F. App'x 707, 709 (6th Cir. 2004); *Dailey v. Accubuilt, Inc.* 944 F. Supp. 2d 571, 578-79 (N.D. Ohio 2013); *Curry v. Goodwill Industries of Kentucky, Inc.*, 2013 WL 1411132, at *8 (W.D. Ky. Apr. 8, 2013) ("The Court finds that Defendant has offered a legitimate, nondiscriminatory explanation for Plaintiff's termination— that [Plaintiff] falsified her time sheets . . . ."). Accordingly, Defendant has presented a legitimate reason for the termination of Plaintiff's employment.

**iii**

Because Defendant has articulated a legitimate reason for its action, the burden of production shifts back to Plaintiff to demonstrate that Defendant's reason is pretextual. A plaintiff generally shows pretext by showing that the proffered reason: (1) had no basis in fact; (2) was insufficient motivation for the employment action; or (3) did not actually motivate the adverse employment action. *Smith v. Chrysler Corp.*, 155 F.3d 799, 805-06 (6th Cir. 1998);

- 11 -

*Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (overruled on other grounds*)*.  Hartman relies on the first and third methods in an attempt to establish pretext.

**a**

To begin, Plaintiff relies on the first method: that the reason for the termination of her employment—time card fraud—had no basis in fact.  Plaintiff explains that she worked from home about 2-2.5 hours each night, as required by her schedule.  While at home, she would organize e-mails and review instruction manuals:

> Q:        And you did not spend two to two and a half hours a night only
>           working on moving files and E-mails into PSTs and reading some
>           manuals, right? That's not what you did is it?
>
> . . .
>
> Hartman:  I would say I spent the bulk of the time going over both instruction
>           manuals, the bulk of the time.
>
> . . .
>
> Q:        And what did you do with the other time that you say you were
>           working at home?
>
> Hartman:  I could be reviewing E-mails, I could be putting E-mails into files.
>           I've made phone calls from home to report a Work Comp claim.
>           I've had phone calls with Stacy and/or Dana; rarely Toby from
>           home.

Resp. Ex. 2 at 80, 84.  Thus, she asserts, she was performing her job duties at home and did not commit time card fraud.

In defending against Plaintiff's claim that the reason for the termination of her employment was pretextual, Defendant relies on the "honest belief rule."  This rule provides that "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect."  *Majewski v. Automatic Data Processing, Inc.*,

- 12 -

274 F.3d 1106, 1117 (6th Cir. 2001).  To determine whether Defendant had an honest belief that Plaintiff had engaged in time card fraud, the Court must look "to whether [Defendant] can establish its reasonable reliance on the particularized facts that were before it at the time the decision was made."  *Braithwaite v. Timken Co.,* 258 F.3d 488, 494 (6th Cir. 2001).  In this regard, the decisional process used by the employer need not be optimal or leave "no stone unturned."  *Smith*, 155 F.3d at 807.  "Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action."  *Id*.  Although the Court must not "blindly assume that an employer's description of its reasons is honest," the Court should "resist attempting to micro-manage the process used by employers in making their employment decisions."  *Id*.  "When the employee is able to produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process 'unworthy of credence,' then any reliance placed by the employer in such a process cannot be said to be honestly held."  *Id*. at 807-08.

Defendant claims that it honestly believed that Plaintiff engaged in time card fraud.  It notes that the bulk of Hartman's responsibilities require her to be logged into the VPN.  When Defendant reviewed Plaintiff's computer records, it noted that Plaintiff had not been logged into the VPN—leading Defendant to assume that she was not working at night from home as she claimed:

| | |
|---|---|
| Q: | There is no way to actually show whether she was working during those times except for the VPN records, right? |
| Ingold: | Well, because the VPN really reflects her job responsibilities.  If she's not at work answering the phone or greeting visitors or doing other things in the office the at-home work would be limited to VPN related activities. |

Ingold Dep. at 60. Moreover, even assuming that Plaintiff was sorting e-mails and reviewing instruction manuals instead of working on the VPN, Defendant did not believe that she could accumulate 2-2.5 hours per night on these activities:

> Q:        And if you do move them into files or folders or e-mails into PSTs then you can read those off-line, right?
>
> Ingold:   Yes.
>
> Q:        So if she was doing what she was doing that would explain why the VPN records don't necessarily track how much time she was spending if she was telling the truth?
>
> Ingold:   Well, and that's the problem. It's just not an activity you're going to spend two, two and a half hours doing everyday. It's maybe a five or ten minute activity at most.

Ingold Dep. at 57.

Plaintiff asserts that Defendant did not adequately investigate the charges against her before it concluded that she engaged in time card fraud. She emphasizes an e-mail from Mr. Dizer that explains the various ways that Defendant could further investigate whether Plaintiff had engaged in time card fraud:

> We won't be able to show duration of time on VPN but can show if she is connecting. If she claims that she doesn't always connect then the question should be "Show us the work that you are doing." If she is moving files, her computer would have a record of that. Can we get her computer to have forensics take a look at it? That would show the activity and if she was using it during the period (which is probably not the case). And if she is moving PST files, I'd ask her to provide details on what's being moved. Two hours a night moving files around?? And last time I checked, you need to be on the network to get to PST files . . . . .

Resp. Ex. 2 at 54. Plaintiff notes that "[t]here is no explanation [for] why Defendant did not follow Mr. Dizer's advice, ask Plaintiff to demonstrate what she had been working on, and forensically review her computer to verify her explanation." Resp. 22.

- 14 -

But an employer's investigation need not be perfect or leave "no stone unturned." *Smith*, 155 F.3d at 807. Instead, it need only be a reasonable investigation. Here, Defendant reviewed the gate log-in times and noted that, to meet her 80-hour requirement, Plaintiff would have had to be working 2-2.5 hours from home each night. Defendant further reviewed Plaintiff's VPN login, explaining that the "bulk" of Plaintiff's job responsibilities required her to be logged in to the VPN network. After noting that Plaintiff had logged into the VPN only twice, the Defendant reasonably believed that Plaintiff would not have been able to accrue 2 hours of work each night from home. This reasonable investigation was all that is required by the honest belief rule.

Moreover, Plaintiff has not shown that Defendant did not honestly believe that she had engaged in time card fraud. For instance, Plaintiff claims that Mr. Dizer's e-mail reveals that Defendant could not have reasonably believed that Plaintiff had engaged in time card fraud based on the objective evidence before it.

But in his e-mail, Mr. Dizer expressed incredulity that Plaintiff could spend two hours a night moving files: "Two hours a night moving files around??" Resp. Ex. 2 at 54. His disbelief was buttressed by his understanding that Plaintiff would have to be logged onto the VPN to move the files—and Defendant had evidence that Plaintiff had logged onto the VPN only twice. *Id*. ("And last time I checked, you need to be on the network to get to PST files . . . . .").

Therefore, objective evidence supports a finding that (1) Plaintiff engaged in time card fraud, thereby violating company policy, (2) such a violation could result in termination, and (3) Plaintiff's supervisors had this information when they decided to terminate Plaintiff's employment. *See Jones v. St. Jude Medical S.C., Inc.*, 504 F. App'x 473, 479-80 (6th Cir. 2012).

Lacking proof that Defendant did not honestly believe that Plaintiff engaged in time card fraud, her "disagreement with [Defendant's] honest business judgment regarding [her] work does

not create sufficient evidence of pretext in the face of the substantial evidence that [Defendant] had a reasonable basis to be dissatisfied." *Majewski*, 274 F.3d at 1116. Defendant is entitled to the protections of the honest belief rule because it has shown that it made a "reasonably informed and considered decision" to terminate Plaintiff's employment. *Smith*, 155 F.3d at 807. Therefore, Plaintiff has not established pretext on the grounds that Defendant's "proffered reasons had no basis in fact." *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012) (emphasis omitted).

**b**

Plaintiff also asserts that the alleged time card fraud did not actually motivate the termination of her employment; that is, she alleges that Defendant's antipathy with her FMLA-leave was the actual motivation. Generally, this method of proving pretext "requires that the plaintiff 'admit[] the factual basis underlying the employer's proffered explanation and further admit[] that such conduct could motivate dismissal.'" *Id.* (alterations in original). This is problematic here because, of course, Plaintiff disputes Defendant's allegation that she engaged in time card fraud. Indeed, the Sixth Circuit has sometimes refused to even consider the "did not actually motivate" method of pretext where the plaintiff did not admit the underlying factual basis. *Chattman*, 686 F.3d at 349 ("Chattman, however, does not admit the factual basis underlying Toho's proffered legitimate reason for his discipline, which eliminates [this] category of pretext."). Nevertheless, in a similar situation, the Sixth Circuit has also analyzed the "did not actually motivate" method even when the plaintiff did not admit the underlying factual basis. *See Blizzard v. Marion Technical College*, 698 F.3d 275, 287 n.6 (6th Cir. 2012) (noting that the "did not actually motivate" method was somewhat incompatible with plaintiff's denial of the underlying factual basis). Although lacking unimpeachable authority, Plaintiff may seek to show

- 16 -

pretext using the third method: that Defendant's belief that she engaged in time card fraud was not the actual motivation for terminating of her employment.[6]

To establish pretext by advancing some evidence that the proffered explanation did not actually motivate the discriminatory action, a plaintiff can "attack[] the employer's explanation 'by showing circumstances which tend to prove an illegal motivation was *more* likely than that offered by the defendant. In other words, the plaintiff argues that the circumstantial evidence of discrimination makes it more likely than not that the employer's explanation is a pretext, or coverup." *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000) (citation omitted) (quoting *Manzer*, 29 F.3d at 1084) (internal quotation marks omitted).[7]

**i**

To support this assertion, Plaintiff emphasizes the fact that Defendant's investigation into her alleged time card fraud only began after she returned from FMLA leave. On April 10, 2013, Plaintiff notified her supervisor that she would need to take time off for surgery. Resp. Ex. 2 at 8. After Plaintiff requested time off for medical leave, on April 24, 2013, Plaintiff's co-worker Stacy McKeon began keeping a log of Plaintiff's work absences and her excuses. And after

---

[6] Permitting Plaintiff to pursue the second method of showing pretext is consistent with Sixth Circuit precedent, which emphasizes that "[t]he three-part test need not be applied rigidly. Rather, [p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Blizzard*, 698 F.3d at 285.

[7] With respect to this method of showing pretext, Defendant once again attempts to rely on the honest belief rule. However, the honest belief rule applies in situations where the plaintiff is attempting to show pretext via the first method—that the employer's legitimate reason had no basis in fact. As noted above, Plaintiff is proceeding not only on the first method, but also the third—that it did not actually motivate the adverse action. Therefore, although the honest belief rule may have shielded Defendant from Plaintiff's claim that she did not actually engage in time card fraud, it does not affect her claim that the alleged time card fraud did not actually motivate the termination of her employment. *See, e.g., Braithwaite*, 258 F.3d at 494-95 (applying "honest belief" doctrine, then separately analyzing whether other similarly situated employees were treated different than the plaintiff); *Blizzard*, 698 F.3d at 286 (applying "honest belief" doctrine, then separately analyzing whether the proffered reason was insufficient to actually motivate discharge); *Ladd v. Grand Trunk Western Railroad, Inc.*, 552 F.3d 495, 503 (6th Cir. 2009) (same). After all, an employer might satisfy the honest belief doctrine while continuing to engage in discriminatory employment practices by thoroughly investigating and taking action only against employees that engage in protected conduct.

Plaintiff returned from surgery, Ms. McKeon was instructed to keep track of Plaintiff's time at work:

> Q:          At some point were you told that you should keep track of Ms. Hartman's time and her, and her activities at work?
>
> McKeon:     That would have been after she returned from her surgery.
>
> Q:          And who told you to keep track of her, her time and what you observed her doing on a day-to-day basis?
>
> McKeon:     That would have been my supervisor, Jack Ingold.
>
> Q:          What do you recall Jack telling, asking you to do?
>
> McKeon:     He asked me to record when she would show up to work, when she would leave for work or leave for lunch, return from lunch and when she would leave for the day.

Ex. C. at 5.[8]  That is, Ms. McKeon was instructed to monitor Plaintiff's time at work after Plaintiff returned to work following her FMLA leave.  This monitoring, in turn, precipitated the investigation into Plaintiff's gate record and VPN log-in times.

"Where an employer treats an employee differently after she [engages in protected conduct] than before she had done so, a retaliatory motive may be inferred."  *Lamer v. Metaldyne Co. LLC*, 240 F. App'x 22, 30 (6th Cir. 2007).  Here, Plaintiff argues that the investigation of her time card reporting following her return to work from extended FMLA leave justifies an inference that it was motivated by her colleagues' frustration with her FMLA leave and not her alleged misreporting of work time after her return.

Certainly, Defendant has marshaled some contrary evidence that would undermine that inference—for example, Ms. Chauvette's observations during Plaintiff's leave that Plaintiff left

---

[8] In addition to tracking Plaintiff's time at work, Ms. McKeon was also instructed to keep track of every instance where Plaintiff was on Facebook, Pinterest, etc.  Ex. C. 9-10.  However, Plaintiff's time on Facebook and other websites was not the basis for her termination.

tasks uncompleted.  But Plaintiff is correct in asserting that she has demonstrated a question of fact about Defendant's motives in deciding to terminate her employment.

ii

In addition to calling attention to the timing of Defendant's investigation, Plaintiff also relies on an e-mail sent by Toby Threet, an attorney Plaintiff was also responsible for assisting. In his September 20, 2013 e-mail to Mr. Ingold, Mr. Threet outlines his suspicions that Plaintiff was not working the full 80-hours as required. He then warns that Dana Chauvette, the co-op, is "out-performing" Plaintiff and that Ms. Chauvette is looking for other jobs.  Finally, and most importantly, Mr. Threet asks: "Do we have enough now to take action? Please?".  Resp. Ex. 2 at 49.   Plaintiff contends that this last sentence in particular illustrates that Defendant's investigation of her time card reporting was begun as a pretext to terminate her employment.[9]

Discriminatory remarks may be some evidence of pretext.  *Ecegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354-55 (6th Cir. 1998).  When assessing the relevance of a discriminatory remark, a court must first identify the speaker.  For example, an isolated discriminatory remark by one with no managerial authority over the challenged personnel decision is not considered indicative of discrimination.  *Id.* at 354 (citing *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1161 (6th Cir. 1990).  The Sixth Circuit has explained, however, that the *McDonald* rule should not be applied formalistically; instead, "remarks by those who did not independently have the authority or did not directly exercise their authority to fire the plaintiff, *but who nevertheless played a meaningful role in the decision to terminate the plaintiff*, were relevant."  *Id.* at 354-355 (citing *Wells*, 58 F.3d at 237-38; *Kelley v. Airborne Freight Corp.*, 140 F.3d 335, 347-48 (1st Cir. 1998); and *Abrams v. Lightolier Inc.*, 50 F.3d 1204, 1214 (3d Cir. 1995) (emphasis added).  In other words, a court must first determine whether a

---

[9] Defendant does not appear to address this argument in its papers.

- 19 -

reasonable jury could conclude that Mr. Threet was in a position to influence the decision to terminate Plaintiff's employment.

Here, Mr. Threet was not involved in the Employee Review Meeting, at which the decision was made to terminate Plaintiff's employment.  However, up until that time, Mr. Threet had been involved in the investigation of Plaintiff's time cards.

As an attorney who worked with Plaintiff, Mr. Threet was involved with the investigation into Plaintiff's absences and her alleged failure to keep up with her work assignments.  He instructed Ms. McKeon and Ms. Chauvette to record the time when Plaintiff was not actively working: "Toby and I [(Stacy McKeon)] talked again today about Kim.  He sent another e-mail to Jack [Ingold] with regards to the issues we are having and what can be done about them. . . . Toby wants us to document the every instance when we see her either texting, on FB, Pinterest, printing recipes, etc.  Document what she is doing, date and time."  Pl.'s Resp. Ex. 2 at 51.

Moreover, when Ms. McKeon reported on Plaintiff's absences, she sent the e-mail to both Mr. Ingold (Plaintiff's supervisor) and Mr. Threet.  *See* Pl.'s Resp. Ex. at 24 ("Also, since it has been about 5-1/2 weeks since Kim returned to work, I wanted to let you know that I have been tracking her hours since she returned to work (w/restrictions & w/o restrictions)."); at 28 ("I'm really not sure how she can get the hours in that are needed."); at 29 ("I think Toby [Threet] left you a message about some matter/invoice issues that have come up since Kim has been off on FMLA."); at 31 ("Also, attached is the most recent documentation that I have with regards to Kim's hours, as well as some comments.").  A reasonable jury, could conclude that Mr. Threet played a meaningful role in Defendant's decision to terminate Plaintiff's employment.

Consideration of a speaker's role in the employment decision adversely affecting the plaintiff does not end the inquiry. *Ercegovich*, 154 F.3d at 355. The substance of the discriminatory remarks must be examined to determine their relevancy to a plaintiff's claim that an impermissible factor motivated the adverse employment action. *Id*. The Sixth Circuit has identified four factors to be evaluated when considering an allegedly discriminatory remark:

> (1) whether the statements were made by a decision-maker or by an agent within the scope of his employment; (2) whether the statements were related to the decision-making process; (3) whether the statements were more than merely vague, ambiguous or isolated remarks; and (4) whether they were made proximate in time to the act of termination.

*Peters v. Lincoln Electric Co.*, 285 F.3d 456, 477-78 (6th Cir. 2002) (citing *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325 (6th Cir. 1994)). Having already determined that a reasonable jury could conclude that Mr. Threet could influence the decision whether to terminate Plaintiff's employment, the remaining three factors also indicate that his remark—"Do we have enough now to take action? Please?"—are relevant to pretext. Mr. Threet made the statement in an e-mail to Mr. Ingold, Plaintiff's supervisor and the person responsible for the investigation into Plaintiff's conduct. Indeed, the e-mail was sent on September 20, 2013, about two weeks before Defendant terminated Plaintiff's employment. Construing the e-mail in a light most favorable to Plaintiff, the e-mail could be construed as some evidence that Defendant was seeking a reason to terminate Plaintiff's employment.

### iii

The fact that Defendant's investigation began after Plaintiff took FMLA leave, coupled with Mr. Threet's remark in the September 20, 2013 e-mail, justifies Plaintiff's FMLA retaliation claim surviving summary judgment and proceeding to trial. Of course, it may very well be true that Plaintiff's termination was motivated solely by her alleged time card fraud. But the

evidence submitted by Plaintiff demonstrates a genuine issue of material fact requiring that Defendant's motion for summary judgment be denied on Plaintiff's FMLA retaliation claim.

## B

Defendant also seeks summary judgment on Plaintiff's disability discrimination claim, in which Plaintiff alleges that Defendant violated the PWDCRA by terminating her employment because of her disability. "[T]he PWDCRA generally protects only against discrimination based on physical or mental disabilities that substantially limit a major life activity of the disabled individual, but that, with or without accommodation, do not prevent the disabled individual from performing the duties of a particular job." *Peden v. City of Detroit*, 680 N.W.2d 857, 863 (Mich. 2004).

To establish a prima facie case of discrimination under the PWDCRA, a plaintiff must establish: (1) that she is disabled as defined by the PWDCRA; (2) that the disability is unrelated to her ability to perform the duties of her particular job; and (3) that she was discriminated against in one of the ways described in the statute. *Peden*, 680 N.W.2d at 863. Consistent with the tripartite analysis set forth in *McDonnell Douglas*, the defendant must then provide nondiscriminatory reasons for the adverse action. *Vorachek v. Security Federal Credit Union*, 2009 WL 4506440, at *3 (E.D. Mich. Dec. 1, 2009).

## i

Defendant asserts that Plaintiff cannot establish a prima facie case of discrimination because she is not actually disabled. Under the statute, a disability is defined as: (1) "[a] determinable physical or mental characteristic" that "substantially limits 1 or more major life activities of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position," (2) a history of such, or (3) being regarded as having such a disability.

- 22 -

*Peden*, 680 N.W.2d at 863.  The Michigan Court of Appeals "has defined major life activities as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." *Chiles v. Machine Shop, Inc.*, 606 N.W.2d 398, 407 (Mich. Ct. App. 1999).  "Thus, any 'substantial limitation' suffered by an allegedly disabled individual must relate to one of these activities." *Id.* (footnote omitted).  In addition, the word "substantial" "clearly precludes impairments that interfere in only a minor way with the performance of manual tasks from qualifying as disabilities." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 196-96 (2002).  "[A]n individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Id.* at 198.

"In determining whether or not a listed impairment is 'substantial' the Court should consider: (1) the nature and severity of the impairment, (2) the duration or expected duration of the impairment, and (3) the permanent or expected permanent or long-term effect." *Hawkins v. Genesys Health Systems*, 704 F. Supp. 2d 688, 702 (E.D. Mich. 2010) (citing *Chiles*, 606 N.W.2d at 408).  It is not enough for the plaintiff to assert diminished capacity; instead, the plaintiff must provide "some evidence beyond the mere existence and impact of a physical impairment." *Chiles*, 606 N.W.2d at 406; *Toyota*, 534 U.S. at 198 ("It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment.").

Plaintiff has not shown that her alleged disability substantially limits one or more of her major life activities.  Plaintiff claims that her shoulder pain interfered with and "started to impede my quality of life."  Resp. Ex. 3 at 14.  She testified that "[t]here were some things that I refrained from doing if it was painful," such as reaching over her head and behind her back.  *Id.*

- 23 -

at 15-16.  She further explained that she would sometimes need to complete tasks with her left hand instead of her right due to the pain.

Although Plaintiff experienced pain, she has not shown that this pain substantially limited a major life activity.  Indeed, she does not identify a single major life activity that was affected:

Q:              Were you able to—you were able to work?

Hartman:        Certainly.

Q:              You were able to drive your car?

Hartman:        Yes.

Q:              Were you able to take care of yourself?

Hartman:        Yeah.

Q:              Cook, clean, take a shower, that kind of thing?

Hartman:        Sure.

. . . .

Q:              So things that would have been uncomfortable or difficult to do you didn't do, but the general things in life you were still able to do, correct?

Hartman:        Correct.   And the things that were difficult I could typically manage with my left hand.

*Id.*

Indeed, the only limitation identified in her deposition was an inability to lift some heavy objects:

Hartman:        [I could n]ot lift[] terribly heavy things.  I don't think this impacted work, as my job really wasn't a heavy lifting job.

Ex. 15-16.  But general lifting restrictions do not constitute a disability.  *Chiles*, 606 N.W.2d at 408.  The Michigan courts have "explicitly adopted federal holdings that 'evidence of a twenty-

- 24 -

five-pound lifting limitation does not suffice to establish a genuine issue of material fact regarding the existence of a disability because it is not a substantial limitation when compared to the average person." *Id*. (quoting *Lown v. JJ Eaton Place*, 598 N.W.2d 633, 638-39 (Mich. Ct. App. 1999)).

Although Plaintiff does not identify a major life activity that was substantially limited, she implies that her inability to drive fulfills this criterion. Plaintiff asserts that her pain "progressed to the point that she could not drive or work," but this assertion is contradicted by her testimony:

Q:          You were able to drive your car?

Plaintiff:   Yes.

. . .

Q:          Were you able to—you were able to work?

Hartman:    Certainly.

. . .

Hartman:    [I could n]ot lift[] terribly heavy things. I don't think this impacted work, as my job really wasn't a heavy lifting job.

Resp. Ex. 2 at 15-16. Thus, Hartman has not shown that the nature of her impairment, psoriatic arthritis, was so severe as to substantially limit a major life activity.

In other words, Hartman presents no evidence that her psoriatic arthritis substantially limits—or presently limits to any degree—her ability to work or engage in some other major life activity. Accordingly, Hartman has not established a genuine issue of material fact as to whether she was disabled under the PWDCRA.

**ii**

Even though Plaintiff did not suffer an actual disability, she can nonetheless establish a prima facie case if she can "prove that the employer *perceived* [her as] actually 'disabled' within the meaning of the statute." *Chiles*, 606 N.W.2d at 406 (emphasis added). In perceived disability cases, a plaintiff must prove the following:

> (1) the plaintiff was regarded as having a determinable physical or mental characteristic; (2) the perceived characteristic was regarded as substantially limiting one or more of the plaintiff's major life activities; and (3) the perceived characteristic was regarded as being unrelated either to the plaintiff's ability to perform the duties of a particular job or position or to the plaintiff's qualification for promotion.

*Michalski v. Bar Levav*, 625 N.W.2d 754 (Mich. 2001); *see also Hawkins*, 704 F. Supp. 2d at 702. "[S]howing that an employer thought the plaintiff was somehow impaired is not enough; rather a plaintiff must adduce evidence that a defendant regarded the plaintiff as having an impairment that substantially limited a major life activity—just as with an actual disability." *Chiles*, 606 N.W.2d at 406.

After Plaintiff returned from surgery, she informed her coworkers and employer that she had psoriatic arthritis, which is an incurable and degenerative condition. Ex. 2 at 49 ("I told [Jack Ingold], unsolicited, that this was an underlying psoriatic arthritis issue that I'd had."). Plaintiff claims that, based on the permanence of this condition, her employer perceived her as disabled and was concerned about the need for future medical absences:

> Hartman:    I think the only thing that I want to leave open is there was a conversation with Stacy McKeon at a later point where she had asked me, since this was a degenerative type of disease, would I be having surgery on anything else.

In other words, Plaintiff contends that her employer believed that she would require additional surgery down the road, and therefore perceived her as disabled.

- 26 -

Plaintiff's "perceived as" theory is foreclosed by the Michigan Supreme Court's holding *Michalski*. In *Michalski*, the court analyzed plaintiff's claim that her employer perceived her as handicapped due to her diagnosis of multiple sclerosis, which, although in its dormant stage, had a poor prognosis for future disabling symptoms. Concluding that plaintiff did not have a characteristic that "currently create[d] a substantial limitation on a major life activity," the court held:

> [Plaintiff] presented no evidence that [her employer] regarded her as unable to perform basic tasks of ordinary life. Indeed, from all indications, she was physically capable of performing her job duties. At most, plaintiff presented evidence that she informed the defendant that she had been tentatively diagnosed with multiple sclerosis and that he believed that this might substantially limit her major life activities in the future. Thus, the trial court properly granted summary disposition on plaintiff's claim that she was regarded as handicapped under the HCRA.

463 Mich. at 733-34.

Plaintiff's "perceived as" theory parallels the theory of the *Michalski* plaintiff: that her employer perceived her as a "liability" in the future, implying that her employer feared later episodes would require surgery. As explained in *Michalski*, this theory is barred because a perceptual discrimination claim must be based on an impression that the individual is *presently* disabled. Plaintiff clarified that, after her successful surgery, she was completely asymptomatic and pain-free:

| Q: | What you just did now, was that difficult right now for you to do? |
|---|---|
| Hartman: | Not at all. |
| Q: | That's fine? |
| Hartman: | Since surgery, yes. |

. . . .

- 27 -

> Hartman:     [T]hat day on that time when I came back to work, I was fully released to come back to work.  There was not a concern about the shoulder I just had surgery on, and it was everyone's understanding, to the best of my knowledge, that I was back to work full-time, and there wasn't a need to worry about my shoulder any further.

Ex. 2. 16, 69.

Thus, at the time Plaintiff informed her coworkers and employer that she suffered from psoriatic arthritis, she was completely asymptomatic—just like the plaintiff in *Michalski*.   As noted above, Plaintiff has not identified a single major life activity that was substantially impaired by her psoriatic arthritis—even when she was symptomatic and required surgery.  Nor has she provided any evidence from which a reasonable jury could conclude that her employer "perceived" her psoriatic arthritis as substantially limiting a major life activity.   Accordingly, Plaintiff has not established a genuine issue of material fact regarding whether her employer perceived her as disabled.  Therefore, her disability discrimination claims under the PWDCRA will be dismissed.

## III

Accordingly, it is **ORDERED** that Defendant The Dow Chemical Company's motion for summary judgment (ECF No. 21) is **GRANTED IN PART AND DENIED IN PART**.  Plaintiff Hartman's FMLA Interference claim and Disability Discrimination claim pursuant to the PWDCRA are **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that the hearing set for January 14, 2015, is **CANCELLED**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: December 22, 2014

- 28 -

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on December 22, 2014.

s/Tracy A. Jacobs
TRACY A. JACOBS